The next matter, number 161549, Best Auto Repair Shop, Incorporated, et al. v. Universal Insurance Group, et al. Good morning, Your Honors. Carl Sanchez and I represent the appellants, Elvis Martinez-Evangelista and Best Auto Repair Shop. Chief Judge, I would like to request three minutes for rebuttal. Three minutes. Thank you. Your Honors, two federal judges looked at this record, including the direct evidence of discrimination and the controversies over the material facts, and the two of them concluded that this is a case that is not proper for summary judgment. The district court reached a different result on a motion for reconsideration, including, and this is an error of law, holding, interpreting Section 1981 not to cover the contracts that Mr. Martinez had with his clients and the contractual relationships that he had with his clients, Your Honors. And the definition of Section 1991, the term make and enforce contracts, is very clear. In the second part, it states that it includes the enjoyment of all benefits, privileges, terms, and conditions of a contractual relationship. And there's no, Your Honor, I submit there's no dispute that there were contracts that were impaired by the interferences that were carried out by Universal. In fact, if you look at the response that Universal presents to our condition. Let me just stop you there, assuming there was a contract, just so I understand what the district court held. I thought the district court was holding, it could be wrong about this, but I thought it was holding that under 1981, Universal wasn't sufficiently in control of the contracting decisions of those parties that would make contracts with your client's company to be liable under Section 1981. The district court could be dead wrong about that. But as I read your brief, I didn't see you responding to that argument. They're dead wrong about that because... I didn't put my question the right way. I'm not interested in whether the district court's dead wrong about that. I'm interested in whether you responded to that argument in your brief because the red brief says straight out you waived that argument by not addressing it. And as I read your brief, I don't see where in your opening brief you do address it. So can you point to me where in the brief you address that argument? Judge, I think the point is that there were 16 contracts that were being interfered. What the district court holds is that there was no interference under Section 1981. And in fact, as Judge Carreño held in her report of recommendation and Judge Dominguez confirmed, there were interferences with the contract that Mr. Martinez had. And let me talk in that sense about what the district court did with respect to the condition present. Because Mr. Martinez... I think we're still not, maybe I'm not making myself clear. I'm not talking about whether your argument that there was a contract between those car owners that sought service in your company and your company. I'm talking about the district court's ruling that under Section 1981, Universal couldn't be liable for violating Section 1981. Because its level of control over the contracting parties, car owner and your company, was too remote or slight. They say in their brief that whether or not the district court was right about that legal conclusion, your brief doesn't address the argument. And I'm telling you that when I read your brief on first pass, I didn't see you addressing that argument. So could you just identify where in your brief you do address the argument? Because otherwise it seems like it's waived. Your Honor, I don't believe that it's waived. Because that is an argument that goes directly, and I would go back to the discrimination. In other words, what the district court is doing by making that statement and they're saying we're waiving, it's making assumptions of fact, making credibility determinations, weighing the evidence. Where in your brief do you address it? Not whether you're right, but I just want to see where in your brief. It's in my brief when I mentioned the contracts that Valentin had, that Maldonado had. It's covered there. It's covered obviously in this record. Your Honor, those aren't arguments about Universal's relationship to the contract between the car owners and your company. Your Honor, in the sense that they have to go to Universal, and that's where the conditional precedent comes in. They have to go to Universal so Universal would inspect the automobile in my client's shop. And that was that, Your Honor, Mr. Martinez said, that he would wait for that. I will point out here, while I'm mentioning that, that in that sense, district court made an error of law. Because he cited to Massachusetts law and said, well, this is the conditional precedent. And that's why, and what he should have done is actually apply Puerto Rico law. And under Puerto Rico law, it's clear that after September 21st, 2007, when defendant Ortiz stated, I'm not going to visit. I thought the district court was saying that even assuming it's a conditioned precedent, it still remains the case that the car owner can make a choice as to whether to contract with you or not. And you, I think, are implicitly saying that's ridiculous. Exactly, Your Honor. But you don't say that, and if you don't say where he gets the law wrong, you don't say what the test should be instead of that, which is why I take it they're saying you've waived your right to now on appeal contest that because you're just arguing that there was a conditioned precedent. And I think they're saying that's half of the legal argument, but the full legal argument would be, and because there's a conditioned precedent under Section 1981, there has to be liability for XX and X, but you don't say those other sentences, and I think that's why they're saying there's a waiver. And I guess I'm trying to figure out where can I find in your brief a legal argument that has the district court got it wrong in that regard. Judge, the district court got it wrong because in making that legal argument, that's almost like a mixed fact of, he's making factual assumptions, Your Honor, that these customers could go and contract with Mr. Martinez without getting the car inspected, Your Honor, and that's exactly where they get it, where it's completely, it's a bizarre argument to make, and I don't think there's anything waived on this record, on our briefs. We address that, and we address that, Your Honor, with respect. What we argue is that the conditioned precedent under Puerto Rico law, under Title 31, Section 3047, was fulfilled when Universal, in September 21st, 2007, said we're not going to inspect cars at Best Auto. And Your Honor, again, the district court, and I pointed out in my briefs, he's focusing a little, conducting mini-trials of the evidence, and not looking at the entire picture. In fact, the district court was rejecting direct evidence of discrimination, Your Honor, including the testimony of Sanchez Huerta, and he cannot do that on summary judgment. Sanchez Huerta testified that he would hear the comments of that Dominican expressed by supervisor, and he named them, you met, followed in our briefs, Your Honor, and that cannot be divorced from, to make a legal argument that somehow we're allowed to contract when these supervisors have this discriminatory animus towards our client, and what they're doing is they're targeting our clients. That's what's so unusual about this, Your Honor, and this goes to pretext. The Universal, when it encountered problems, and this is in the record, when it encountered problems with other repair shops, Universal would simply, if the shop was in the network, would drop them from the network. If not, in a few instances, they said, well, we're not going to inspect cars, and that's what they alleged. Here, Your Honor, the type of targeting that they implemented against Mr. Martinez is completely disproportional to their standard business practices with respect to discipline to the repair shops, Your Honor, and the district court called it gradual. It was actually an all-out assault that started on September 21st and concluded December 3rd, and it was so disproportional in comparison to what other repair shops were doing, which the other repair shops were even committing fraud against some of these clients. In this record, there's not one complaint from a client of Mr. Martinez about the quality of the repairs. There's not one complaint about any insurance broker, and yet Universal targets Mr. Martinez by interfering with his contract by sending a letter to their clients telling them, we don't have commercial relations. That happens in October 5th. In December 3rd, they say, okay, we're going to remove every car from Universal, and they say, well, we're going to be interfering with every contract by trying to remove the cars, and the record is full of interferences. The interference with the contract with Pimentel, with Rivera, with Maldonado, with Valentin. And, Your Honor, to come back to my first assertion about the contractual relationships, in this record, Mr. Martinez had long-term contractual relationships, and this is admitted even by Universal in their reply to additional statement of materials facts, docket 128-2, with respect to, for example, client Joaquin Monserrate, who repaired cars three or four times in Bestalco. And Mr. Martinez testified that he never came back to repair cars after it was removed in 2010. And, again, this targeting was so disproportional that, frankly, when Judge Carreño looked at it and when Judge Dominguez looked at it, he said, this is an issue of motive and intent that has to be resolved by a jury. Your Honors, the other fact that I think is important when you consider the evidence in this case is that Mr. Martinez tried to meet with the friend at Ortiz to resolve the differences, and that is on the record. In June of 2007, he actually went to Universal to try to resolve the differences. This is before he found out that they were making racist remarks about him in the Carolina office. And Juanita refused to meet with him. Can I just go back to, I guess, this waiver thing, which is still bothering me? If you just look at the district court's opinion, he's got one, two, three, four and a half pages on something called scope of coverage of Section 1981, in which he cites five different, I think, courts of appeals cases, explaining why he thinks the scope of Section 1981 coverage does not apply. And as I read that, none of it hinges on him denying that there might be a condition precedent. And if I read your briefing, the only thing I can find that addresses any of it is one footnote in the reply brief. Judge, I would suggest that the main thrust of my brief is that the judge is making, when he's reaching that, when he's making that legal argument, he's not really, he cannot apply it to these facts. Because in order for a universal insurer to contract with my client, universal had to inspect. That's how my client would get paid. Because universal would pay the client, and then my client would get paid. And so that legal argument that he makes is contrary to this fact, the facts in this record. I have just one follow-up question. You do make references periodically in your brief to the post-summary judgment unsworn statements, the affidavits. Did you object to those at the summary judgment stage? Judge, I didn't file a motion to strike them, but I did object to them in my motion. I think that's the quality of the evidence. Just tell me, so you did object, you're saying, at the time? Yes, well, in my paper, when I responded to the assertions that they were making in the affidavits, I objected to them. I told them that these were last-minute assertions made by a lot of employees that were never announced in this coverage. Okay, thank you. Thank you. Good morning. If I may, Juan Casillas, on behalf of APELIS. What BESALTO wants is to have universal pay for any claim, even if Martinez jumped on a hood. And in doing so, they want to do away with what this court held in Aleman Pacheco. There are pre-existing contractual rights of universal in their insurance policy. That insurance policy is basically standard throughout the states, and it's approved in Puerto Rico by the regulator. What BESALTO wanted was universal to surrender its loss liquidation clause, which was validated by the regulator. The only document that resembles a contract is at Appendix 2557. And this goes to the issue of whether there's a contract or not. It was clear that Mr. Martinez didn't want to have a contract with universal. That's describing the section of, you know, the scope of the 1981 claim. It was clear that he didn't want to be a part of the network. This exhibit shows basically the loss liquidation clause. It allows for, and I'm going to quote you, Mr. Martinez agrees to perform the repair of the auto within a term of 15 days. As long as the insurance company responsible for paying the damages cost meets its ministerial duty and takes all the necessary steps within a prompt and reasonable amount of time and completes its inspection of the damages. It goes further and says, It's going to be in 15 days from the moment the insurance company responsible for paying the damages cost inspects and realizes, determines the total amount of parts that need to be changed and estimates the total cost within the original market price. Out of thousands of pages in the appendix, this is the only written document that resembles a contract. Saying I have a contract is nothing but a compulsory allegation. The Puerto Rico Civil Code defines what a contract must have. And if you look at the record, there's no single case showing that there existed a contract and worse, that universal didn't allow appellant's clients to enter into independent contracts with their customers. All we have here is a case of discrimination, but this circuit has always required the showing of discriminatory intent and simply put, there's none. The case doesn't, you know, discrimination doesn't occur on a vacuum. We have other jobs owned by black and Dominican nationals. None of them, not one, except appellant. So for any type of corrective measure, regardless of whether they were part of the network or not, there were other jobs, I'm sorry, no one else, aside from Ms. Mass, was part of the boycott that is contemporary, that is, there's a temporary proximity between the boycott to universal business initiative of the network, of the discount policy. And Ms. Mass, who was the co-chair of that particular meeting, never, in the record of summary judgment, there's never a single incident regarding Ms. Mass. There were, there's evidence that Ortiz, as the sole decision maker, received information even from the regulator that Mr. Martinez was instigating complaints against the company. So when broader counsel refers to, you know, that they wanted to meet, all of these events of trying to boycott the network was taking place, and the record shows that Ms. Ortiz had met previously with Mr. Martinez in 2001 and 2004. There were complaints from adjusters, from within universal and outside universal, particularly the incident of, you know, appellants jumping in and out. Can I ask you about the waiver argument? Yeah, sure. So, the district court says, universal has been sued for not financing universal's client's choice of best auto to repair cars. Then the district court concludes, but no one prevented anybody, including universal's insurance, from entering into a contract with plaintiffs and paying for plaintiff's services, if they wished to do so, on whatever terms they agreed to. It was a choice open to those interested in having plaintiffs perform repair work for them. That's why this case, Lincoln-Harris, it can't be concluded that universal blocked plaintiffs from contracting with individuals. You say that he's waived any response to that argument. That's right. If I understand what he's saying, that's just a misconstruction of his brief, because his brief is saying that's just dependent on a factual assertion about how significant it was that the insureds, who would want to get service from best auto, wouldn't get compensated from universal if they got the repair done by best auto. So he says his brief, every time he's making a point about how, given the fact that universal wasn't going to pay for the insured to get it done at best auto, that shows universal was actually interfering with the ability of that contract to get made. So he hasn't waived it. He's just contesting the factual premise of the district court's legal argument. What's your response to that? Honestly, Your Honor, I think that's a stretch, what he's arguing. The first premise is that there's no contract and there's no evidence on the record that anyone was prevented from entering into a contract independently from universal's lack of power, because the whole issue of the 1981 is whether universal has enough power to force his clients or his potential clients to enter into a contractual relationship. Practically speaking, if I'm an insured, would I go to best auto to get them to repair the car if I know the insurance company's not going to... The evidence shows on some of them that's actually what happened. Their customers, if you look at the... There are 11 cases discussed by the judge Delgado on what he's called enforceable contracts. One is Aleman Pacheco, which is this court's prior decision. Miguelina Tejeda, which is the contract, right? The record doesn't show what ever happened there, but the remaining nine, six of them were repaired at best auto. The other three are boarding company. So that goes to show you on the record that best auto's clients could and did enter into contracts with them, and eventually they could... Some of them went to the regulator, to the insurance commissioner's office, and filed claims, and they were dismissed. Others filed suit, and universal, for various reasons, decided to settle them. One of them was a total loss, because the condition precedent and the loss of liquidation is a separate thing, Your Honor, from the fact that the 1991 claim, at the summary judgment stage, the appendix needed to proffer evidence. Obviously, contracting with universal, that's an issue because he never wanted to be in the network. He despised it and tried to dismantle it. Secondly, and there are black, all black owners, and Dominican nationals, within that network, and that's an admitted fact. The other area is, is there any evidence on the record that a insured or a third-party claimant was prevented from entering into a contract with best auto, and there's none. That is why we consider there are two separate issues, and the first one is waiver, and that's a jurisdictional basis. After that, we would have in court, in federal court, federalizing basically every contractual dispute, and that's what the judge basically avoided by doing a reason analysis on whether there's discrimination or not. Or this new, he was black since at least 01, on 01, 02, 03, or 04. They were doing business. As I understand, there was a pattern of use of this workshop at some point, wasn't there? A pattern of what, I'm sorry? A pattern of work being allowed at that auto shop. Well, they were, they were problems recorded in 2004. I'm not talking about, I just want to know, was that body shop used at some time by your client? By my client directly, no, because the way it operates. Well, by insurer, yes, and by third-party claimant, yes, and that's always been the case. And at some point, that stopped? At some point in time, my client decided he would no longer send adjusters to inspect the vehicle's damages, which is a right under the loss reclamation clause and the adjustment process. And there's a right to show why that happened? Yes, of course. It shows, and that goes to Ortiz's decision. She had received at least four different complaints from different adjusters, including an independent adjuster, which is basically not an employee of the company. Well, your client claims that this was done for that, and because he was organizing a group to not use your services. It was progressive, and that's the point. All right, that's your view. Their view is that it was done because of discrimination. But that's a conclusory allegation because there's nothing linking the decision maker, which is Juanita Ortiz, the vice president of claims. And remember, this is a business that operates throughout the entire island with multiple satellite offices. So there's no evidence of discrimination here, aside from conclusory allegations. If that were the case, if you look at the record. Well, I understand that. But I also was of the impression that he's claiming that there were racial remarks that were made. And they were addressing the opinion as straight remarks. Why? Because there are several layers. The point I'm trying to get to is you have two different views of the facts. It seems to me that's not the kind of case that should be decided by summary judgment. Well, I respectfully disagree. I'm posing a question. All right, the decision maker. In every discrimination case, if you want to get into the 1981 case, you have to tie the discriminatory remarks with the decision makers. And there's no evidence on the record. Wasn't there a statement by a supervisor who said something like, we trying to get this black Dominican so we can't get business or something like that? There's a statement about adjusters. And the we, in Spanish, obviously, in order for it to make sense, you have to add the we because it says, I have to add the we because if not, the translation doesn't make sense. Why don't you tell me how it's said? Vamos a sacar la carrera. Why don't you tell me so I can understand. Then we argue this because the we, and that's what I said. What's the statement in the record? We're going to take him out of business. We're going to take him out of business. We are, yeah. So you couldn't conclude that that's an indication that the company as a whole is going to do it? No, because you have to conclude that that particular adjuster is a decision maker when the judicial admissions on the record shows that there's only one decision maker. Why couldn't you just say that the adjuster, at that point, is just stating what he understands to be company policy? Because the only company policy, if this is led better, the only company policy is I'm not going to go into the business. And if you look at the record, it's funny because it says we're going to, we took him, the complete sentence is we took him out of the network, the repair network, and we're going to take him out of business. He wasn't, he was never, look at the lack of knowledge of that person. Mr. Martinez was never a part of the network. Never, ever. And he wouldn't want to. So you have someone on the very low, this is an unaccepted employee with no discretion under FSA if you look at it that way. You have someone in a company that has 1,000 employees. You have someone in a satellite office in Carolina. He had no supervisory function as adjuster? No. No. And there's no connection. He never attended monthly meetings. The evidence, and this is addressed in the district court, in Judge Delgado's opinion, in a very detailed fashion, on why is it that that person, there's no connection between him and the decision maker. And that is why if you look at a parent's effort to try to walk away from their judicial admission that Ortiz was the sole decision maker, they're trying to tie every single adjuster in every office that is either, you know, sending out letters, for example. Because the policy was, I'm not going to go into your shop. We're going to discontinue business with you. That's all it was. Was it because of race? Mr. Ortiz knew his race from at least 01, and they did business. Didn't Mr. Ortiz have a meeting with universal employees to complain about Sanchez-Fragoza's statements? Not with Ortiz. He met in 2001 with Juanito Ortiz and in 2004 with Juanito Ortiz. In 2000... To complain about the... The Sanchez-Fragoza comment, yes. What happened, some employee, and the evidence on the record shows that that information or that complaint never made its way to Ortiz, and that's a strong testimony, and the employees also. Was there any investigation made by anybody about it? No. It never relayed any information, but we addressed on the brief, and as Judge Delgado did, that there's no obligation because this is not an employment case. They'll also require us to investigate. Remember, we have hundreds of adjusters. Not all the information adjusters receive go up to the channels of Mr. Ortiz because it's, you know, the claims department is the biggest department in Universal. But I have no legal obligation, but at the end of the day, Ortiz never took race into account when making his decision. There's a temporal proximity of the boycott. There's a temporal proximity of the regulator stating to her, Martinez is posing under a different name and instigating complaints against the company. That's the only temporal proximity you have here. Any other questions? Thank you. I just want to follow up Judge Torbuella's question. Not only was there no investigation, Sanchez-Fragosa, who was making the remarks, and it wasn't one. He made them in June, and he made them back later in December. There was never an interview as to why he was making those racist remarks, although Mr. Martinez went to Universal to meet with two supervisors, and the link is that Sanchez-Fragosa was supervised with the person that Mr. Martinez meets, which is Nelson Medina. And Nelson Medina was supervised by Defendant Ortiz. Judge Carreno found all of this in her report and recommendation, and Judge Dominguez confirmed it. My opponent got up here and said that no one else from the August meeting, the 110 body shop owners, did anything like Mr. Martinez. The record actually shows that's not quite right. Eduardo Pui, the owner of Borinquen Body, from where most of the cars that were removed from Best Auto were taken, in February 2007, he gets suspended because he's defrauding a customer, he's conducting shoddy repairs, and what happens to him? He just gets dropped from the network. There's no interference with his clients, there's no letters sent to him, there's no information provided to the primary insurance brokers. As was done with Mr. Martinez, this is the point that I was making about how the targeting of Mr. Martinez is so disproportional to what was going on here. And what was going on, the difference between Martinez and Mrs. Ortiz, Judge Dominguez concluded it's inevitable that there are going to be conflicts between a body shop owner and an insurance company. Let me address what's raised here about that Juanita, the defendant Ortiz rule about Mr. Martinez was raised from 2001. Yes, but she was supervised by somebody named Pimentel. That's on the record until 2006. That was the president of Universal who supervised her. So when Juanita said in 2004, we're going to take out Mr. Martinez, and she said legally, she really meant it. And when Mr. Pimentel was gone and she couldn't take out Mr. Martinez, she proceeded to act discriminatory towards him. And maybe a jury will conclude, no, this was not discrimination. But that's for a jury to decide. It's not for Judge Delgado. She's an adjuster? She was the head of the claims department. And she's got racist remarks attributed to her? Excuse me. Did she make any racist remarks? She did not make any racist remarks. She just said she wanted to get him out of the network. There are a number of communications from her. I guess the question I actually want to ask, is there anyone who is higher than an adjuster who the record shows made a racist remark? Yes, supervisors. And that's in the testimony of Sanchez Huertas, which was disregarded by Judge Delgado. And he specifically mentions Medina and some other names that don't come to my mind as referring to Mr. Martinez after coming out of meetings with Defendant Ortiz, monthly meetings, and referring to him, oh, that Dominican, using xenophobic remarks here. Any further questions? Thank you. Thank you.